No. 71,309

STATE OF KANSAS, *Appellee,* v. JEROME CHEEKS, *Appellant.*

(908 P.2d 175)

Opinion filed December 8, 1995.

*Benjamin C. Wood*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Robert L. Stuart*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Jerome Cheeks appeals his jury conviction of second-degree murder (K.S.A. 21-3402), claiming the trial court erred in: (1) admitting the victim's out-of court statements; (2) failing to instruct on lesser included offenses; (3) admitting evidence seized from the defendant's car; and (4) admitting evidence of the defendant's other crimes and bad acts. Defendant was convicted in the beating death of his wife, Dianne Cheeks.

## The Investigation

Jerome Cheeks arrived at the Kansas City, Kansas, police station around 10 or 10:30 p.m. on November 20, 1992, and reported that his wife had been beaten and raped by a group of men. Cheeks appeared calm and was not crying or emotionally upset. He was directed to return home.

When officers and emergency personnel arrived at the home, there were no signs of forced entry. There were numerous beer cans scattered in the kitchen and the kitchen, bedroom, and bathroom were in disarray. There were strands of hair throughout the house. A hammer was on the bedroom floor and there was fecal

matter on the end of the hammer handle. Blood on the hammer was consistent with the blood of both Dianne and Cheeks as well as around 57% of the general population. Dianne was lying on the bed. Her hair and sweatshirt appeared to be wet and her jeans were unbuttoned and unzipped.

The autopsy revealed that Dianne died as the result of a subdural hematoma, a clot on the left side of her head. Dianne had multiple blunt impact wounds and extensive bruising over her entire body. There were two bruises on Dianne's rib cage which formed fairly symmetrical circles or half-circles. The circle had a ⅞-inch diameter, consistent with the size of the hammer found at the scene. There was a 1½-inch ragged laceration in Dianne's rectum consistent with being sodomized by the handle of the hammer. The pathologist testified that most of Dianne's external injuries were consistent with being inflicted by a person's fist but that the rectal injury was caused by something being thrust up Dianne's rectum and the two circular wounds were probably caused by a hammer. The pathologist placed the time of death between 10 a.m. and 2 p.m. on November 20. He opined that the beating occurred within 24 hours of Dianne's death. Loss of consciousness could have occurred within a few seconds or several hours after infliction of the injuries, and, untreated, the injuries would cause death. There was a great deal of soap on Dianne's head and genital region, and her hair was combed. The pathologist opined that Dianne had taken a shower after the injuries were inflicted and then lost consciousness as she attempted to dress. Dianne also had bruises which appeared to be 3 days old.

Cheeks was living with Dianne during the week before her death, following his release from jail. He informed an investigating officer that he left the residence the evening of November 18 to go to St. Louis and he returned to Kansas City around 6 p.m. on the 20th. Cheeks said that when he returned to Dianne's home around 10 p.m. on the 20th, he found Dianne lying on the floor with her pants down. He placed her on the bed before summoning the police. A police officer testified that Cheeks did not appear upset, but he began to cry when the medical examiner announced that Dianne was dead.

### The Trial Evidence

Cheeks had claimed that he was in St. Louis, Missouri, on November 19 and had returned to Kansas City around 6 p.m. on the 20th. A receipt from a Wendy's restaurant in Kansas City dated 3:17 p.m. on November 20 (almost 3 hours before Cheeks claimed to have returned home) was found in Cheeks' car.

The State called witnesses to show that Cheeks had fabricated an alibi. Cheeks' parole officer testified that while conducting a home visit with Cheeks on the morning of November 18, he heard sounds of water being turned on and off intermittently and of a rag being wrung out or someone washing the floor. Cheeks would not allow the parole officer to speak with Dianne and became distraught and agitated when the parole officer pressed the issue. Cheeks admitted to the parole officer that he and Dianne had had a verbal fight, but he denied any physical fight. The parole officer believed that there was something wrong with Dianne, so he returned to the house with police 15 minutes later. No one was home. An SRS caseworker also testified that she arrived at the house later in the morning on the 18th to check on Dianne. Cheeks informed the SRS worker that Dianne was not home.

A neighbor testified that he observed Cheeks, Dianne, and Cheeks' vehicle at the residence on the afternoon of the 19th. The neighbor stated that Cheeks' vehicle did not leave the house for more than 2 hours that day. On the evening of the 19th, Dianne's landlord went to see her about the rent. Cheeks was at the house, acted belligerent, and informed the landlord that Dianne was gone.

Cheeks had been in jail for most of 1992 (off and on), and during much of that time Dianne lived in various women's shelters. Shortly before Cheeks' release in November 1992, Dianne wrote him letters indicating that she loved him and could not wait until his release. A note from Dianne to Cheeks was found in the basement trash at Dianne's house. It said in part:

"Am I doing the best thing? See, nobody here knows about that but me and you. Let's keep it like that. I don't talk about that to anyone. The only person I talk about that to is someone that means something to me. That is you, Jerome Cheeks. How many times do I have to tell you you are everything to me. I try to look over it when you hit me. I know that's not you, it's the drugs, baby. That's bad, but I

am trying to show you that I care a hell of a lot about you. I am surprised you don't see it in me. If you don't, I don't know what to say. I miss the kids, baby. I miss you, too. You shouldn't even have to ask me about the money. You know Dianne Cheeks is going to do that anyway. Maybe you will appreciate me and take me for what I am one day. Can't you do that—can't you do that for the one that is done for you? You could show me some appreciation one day unless you kill me first. Look, I love you, Jerome Cheeks."

A cellmate of Cheeks' testified that Cheeks told him he had slapped Dianne around and that if Dianne did not get her act straight she would be found in a ditch one day. Other witnesses testified that Dianne had told them that Cheeks had beaten her numerous times during their marriage. The testimony of these witnesses is set out later in the opinion.

Cheeks testified that he did not kill Dianne. He insisted that he and Dianne had a loving, caring, and wonderful relationship which was not as depicted by the State's witnesses concerning the beatings. He believed the witnesses lied because he and Dianne had an interracial relationship. Cheeks claimed that they had only the general problems of a married couple. He did admit that he had struck Dianne once or twice in the last 3 years.

Cheeks testified that after he was released from jail, he returned to Kansas City on November 12. He and Dianne spent the first couple of days at home. They had intended to take a trip to St. Louis on November 18, but when Dianne remembered she had a court date the following day Cheeks decided to go alone. Cheeks stated that he left home on the evening of the 18th, stopped at a couple of bars in the Kansas City area, and left Kansas City around 8 a.m. the next morning. On his way to St. Louis, Cheeks testified, he stopped at a Wal-Mart in Boonville, Missouri and bought a cassette player for his son and a large tote bag to put clothes in. An employee of the Boonville Wal-Mart, 110 miles from Kansas City, testified that a man with a backpack who looked similar to Cheeks purchased a handbag and a cassette Walkman. Cheeks recalled that he arrived in St. Louis sometime in the afternoon on the 19th and went to a jazz bar, had a few drinks, was "out on the town" that night, and slept in his car. He testified that he left St.

Louis around 10 a.m. on the 20th, drove around in the Kansas City area after arriving, and went home at 6 p.m.

Cheeks testified that when he went into the house and announced that he was home, Dianne did not answer. Cheeks stated that he turned on the radio and then went to the bedroom, where he found Dianne lying on the floor. He thought Dianne had been beaten and raped but was not aware she was dead. Cheeks recalled that he laid her on the bed and placed a wet towel on her face. Because they did not have a telephone, Cheeks called the paramedics from a convenience store. After calling for help, he returned to the house and waited for 45 minutes. When nobody showed up, Cheeks testified, he drove to the police department and told the police his wife had been assaulted and raped. Cheeks returned to the house, and the ambulance arrived at the same time. Cheeks testified that the medical personnel did not go into his house until he prompted them and, after looking at Dianne, they told him she was dead. Cheeks testified that photographs of Dianne and her injuries shown to the jury showed more extensive bruising than the way she had looked when he went to get the police.

Cheeks was cross-examined about his statement to police on the night of Dianne's death that he had been in St. Louis. Cheeks stated that he was forced to give false information that he had seen his brother while in St. Louis because the police stated that they would charge him in Dianne's death unless he had a witness who would say that he was in St. Louis.

The jury convicted Cheeks of second-degree murder. He was sentenced to 15 years to life. He appeals.

## VICTIM'S STATEMENTS

The defendant argued at trial that evidence of photographs and out-of-court statements of his deceased wife were inadmissible because, in some instances, the statements were multiple hearsay and that evidence of the events, one of which was 3 years earlier, was too remote in time to have causal relationship. The trial court ruled that the photographs and the prior statements were evidence admissible under the discordant marital relationship exception to show motive and intent. The court admitted the photographs after

observing that there was no difference between the testimony of witnesses describing bruises and photographs depicting those bruises.

The statements admitted were made by the deceased wife to various persons that her husband had repeatedly abused her during the marriage. Dianne's sister and her sister's boyfriend testified that over the 3 years before Dianne's death, Dianne informed them of instances of fighting and abuse inflicted by Cheeks. Dianne's sister did not see her very often but had seen bruises on Dianne's face and arm on an occasion 2 years earlier. In January 1991, Dianne reported that her husband tried to break her leg with the arm of a chair. She had bruises on her face and leg. Dianne stated that her husband beat her all the time.

Dianne also told a psychologist that two of her children had been removed from their custody because she and her husband were abusing cocaine. In March 1992 an SRS caseworker observed that Dianne had been beaten. Dianne stated to the caseworker that Cheeks had inflicted the abuse. She also told the worker that Cheeks beat her and that he used drugs, particularly crack. The worker periodically observed bruises on Dianne over the next couple of months. On each occasion Dianne informed the worker that Cheeks had done it. In April 1992 Dianne reported that she had been beaten by Cheeks. She had severe bruises, cuts, and cigarette burns in her mouth and on her arms and legs. Dianne stated that her husband had burned her and beat her when she refused to steal for him. In addition, he had on various occasions forced her to drink radiator fluid, twisted a screwdriver into her leg, and hit her on the head with a hammer. In July 1992 Dianne reported that Cheeks had burned her back with a hot iron. A women's shelter employee had observed the burn.

In *State v. Green*, 232 Kan. 116, Syl. ¶ 4, 652 P.2d 697 (1982), this court discussed marital discord evidence. The *Green* court held that evidence of a discordant marital relationship, including the defendant's prior acts of violence against his wife and threats to kill her, is admissible independent of K.S.A. 60-455 where the evidence is offered not for the purpose of proving distinct offenses but rather to establish the relationship of the parties, to establish

the existence of a continuing course of conduct between the parties, or to corroborate the testimony of witnesses as to the act charged. The court stated that under such circumstances, a limiting instruction is not required. See *State v. Hernandez*, 253 Kan. 705, 714, 861 P.2d 814 (1993); *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991); *State v. Taylor*, 234 Kan. 401, 407, 673 P.2d 1140 (1983).

A similar conclusion was reached in *State v. Mayberry*, 248 Kan. 369, 807 P.2d 86 (1991). There, several of the victim's friends testified as to the victim's statements of marital discord. The *Mayberry* court observed that on numerous occasions, this court had approved the admission of statements by a deceased victim which demonstrate the deceased's state of mind prior to the murder and which show the existence of a rift between the deceased and the defendant, citing *State v. Wood*, 230 Kan. 477, 479, 638 P.2d 908 (1982); and *State v. Phipps*, 224 Kan. 158, 160, 578 P.2d 709 (1978). It noted that as a general rule in a case of marital homicide, evidence of a discordant marital relationship and of the defendant's previous ill treatment of the spouse is relevant as bearing on the defendant's motive and intent. *Mayberry*, 248 Kan. at 384; see *Taylor*, 234 Kan. at 408; *State v. Fenton*, 228 Kan. 658, 667-68, 620 P.2d 813 (1980).

The statements made by Dianne to others prior to her death were relevant to show past conduct of the accused and was admissible as marital discord evidence which revealed the relationship between Dianne and the defendant. The trial court's admission of the marital discord evidence was not error.

The defendant argues that the evidence of prior marital discord was in some instances multiple hearsay. The fact that marital discord testimony contains a statement made by another declarant and is multiple hearsay is not a per se bar to admission of that testimony. See K.S.A. 60-463, which discusses multiple hearsay.

The defendant also argues that the evidence was too remote to be admissible. Where the fact or facts proposed to be established as a foundation from which an inference may be drawn do not have a visible, plain, or necessary connection with the proposition eventually to be proved, such evidence is excluded for remoteness. See

Black's Law Dictionary 1295 (6th ed. 1990). However, lapse of time may not be sufficient to deprive evidence of its value but goes to the weight of the evidence, which is for the jury to determine. Whether evidence is too remote to be admissible rests within the sound discretion of the trial court. *Green*, 232 Kan. 116, Syl. ¶ 5.

In *Hedger*, 248 Kan. at 820, this court held that a 5-year lapse of time did not make evidence of prior abuse too remote because there was a connection between prior instances of abuse and instances of abuse immediately before the victim's death in that the prior abuse was related to Hedger's alcoholism, and the evidence showed that Hedger resumed drinking shortly before the victim's death. Here, the testimony established a continuing course of con duct and relationship between Dianne and the defendant. The evidence showed a pattern of abuse dating to 3 years before Dianne's death and continuing until her death. The trial court did not abuse its discretion in finding that prior instances of abuse were not so remote that the evidence was inadmissible.

The defendant makes other arguments on appeal concerning the admissibility of the marital discord evidence. These arguments were not made to the trial court and cannot be raised for the first time on appeal. See *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993).

## LESSER INCLUDED OFFENSES

K.S.A. 21-3107(3) requires the trial court to instruct the jury not only as to the crime charged but also as to all lesser included crimes of which the accused might be found guilty. The statutory duty to instruct on lesser included offenses is an affirmative duty of the trial court and applies whether or not the defendant requests the instructions. *State v. Bowman*, 252 Kan. 883, 892, 850 P.2d 236 (1993). The defendant argues that the trial court should have instructed the jury on voluntary manslaughter, K.S.A. 21-3403, and involuntary manslaughter, K.S.A. 21-3404, as lesser included offenses of second-degree murder.

An instruction on a lesser included offense is not required in every second-degree murder case. The instruction is required if there is substantial evidence upon which the defendant might rea-

sonably have been convicted of the lesser offense. *State v. Arteaga*, 257 Kan. 874, 889, 896 P.2d 1035 (1995). However, the duty to instruct on a lesser included offense "does not arise unless there is evidence supporting the lesser offense." *State v. Patterson*, 243 Kan. 262, 267, 755 P.2d 551 (1988). The evidence supporting the lesser included offense must be viewed in the light most favorable to the defendant. The evidence may be inconclusive, unsatisfactory, and weak and consist only of the defendant's testimony. *State v. Coleman*, 253 Kan. 335, 352, 856 P.2d 121 (1993). There is some weighing of evidence in this analysis, but the weighing of evidence is not a retrial of the case. *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992).

The defendant correctly notes that in a prosecution for murder where there is no direct evidence of the manner of the killing and the evidence introduced against the defendant is wholly circumstantial and open to the inference by a jury that the offense committed may have been among the several lower degrees of homicide, it is the duty of the trial court to instruct the jury respecting all the degrees of homicide, with it being the province of the jury, and not of the court, to determine the degree, if any, of which the defendant is guilty. The testimony of the defendant alone, if it tends to establish the lesser degree of homicide, is sufficient to require the court to so instruct. *State v. Johnson*, 220 Kan. 720, Syl. ¶ 1, 556 P.2d 168 (1976). Here, however, even though the evidence against the defendant is entirely circumstantial and there is no direct evidence of the events surrounding Dianne's death, before any lesser instruction is required we must find evidence upon which the defendant might reasonably have been convicted of the lesser offenses.

## Voluntary Manslaughter

Voluntary manslaughter is the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403. The key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. *State v. McClanahan*, 254 Kan. 104, 113, 865 P.2d 1021 (1993); see *State v.*

*Hamons*, 248 Kan. 51, 63, 805 P.2d 6 (1991). Whether a provocation is legally sufficient is an objective, rather than a subjective, determination. To be legally sufficient to intentionally kill an individual, a provocation must consist of more than mere words or gestures, and if assault or battery is involved the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. *McClanahan*, 254 Kan. at 114. This court has stated that a provocation is legally sufficient if it is calculated to deprive a reasonable person of self-control and to cause the person to act out of passion rather than reason. *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985).

There was evidence of marital discord but no evidence that Dianne had provoked her killer. There is no substantial evidence upon which the defendant could reasonably have been convicted of voluntary manslaughter, and the trial court was not required to instruct on that offense.

## Involuntary Manslaughter

Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to a felony, or in the commission of a lawful act in an unlawful or wanton manner. K.S.A. 21-3404. It is a lesser crime of second-degree murder. See *State v. Gregory*, 218 Kan. 180, 183, 542 P.2d 1051 (1975). The defendant contends that the killing may have been unintentional.

Involuntary manslaughter requires, in addition to an unintentional killing that the killing be committed in the commission of an unlawful act not amounting to a felony or in the commission of a lawful act in an unlawful or wanton manner. There is no evidence that Dianne's assailant was committing a lawful act in an unlawful or wanton manner. Defendant suggests that Dianne's assailant may have only intended to inflict a beating, an unlawful act not amounting to a felony, but he does not specify what this underlying act would be. We note that battery, which is "the unlawful, intentional touching or application of force to the person of another, when done in a rude, insolent or angry manner" is a class B misdemeanor. K.S.A. 21-3412. However, aggravated battery, which includes the

unlawful touching or application of force to another person with the intent to injure that person and which inflicts great bodily harm, is a class C felony. K.S.A. 21-3414.

The evidence here is that great bodily harm was inflicted, so the battery was an aggravated battery, a felony. There is no evidence upon which the defendant could reasonably have been convicted of the lesser included offense of involuntary manslaughter, and the trial court did not err in refusing to instruct on that offense. See *State v. Crispin*, 234 Kan. 104, 109-10, 671 P.2d 502 (1983).

## EVIDENCE SEIZED

Prior to trial, a defendant may move to suppress evidence obtained from an unlawful search and seizure. K.S.A. 22-3216. The motion must be in writing and state facts showing that the search and seizure were unlawful. The judge shall receive evidence on any issue of fact necessary to determine the motion, and the burden of proving that the search and seizure were lawful is on the prosecution. K.S.A. 22-3216(2).

The defendant argues that the trial court erred in admitting evidence seized from his car. The defendant filed a pro se motion to suppress this evidence, claiming that the search was unlawful, but the motion failed to state why the search was unlawful. The trial court did not rule on the defendant's pro se motion.

The defendant suggests that the trial court had an affirmative duty to rule on his pro se motion. The pro se motion merely made a conclusory assertion that evidence was "obtained through the work product of an unlawful search and seizure" from his car and the motion did not state facts showing how the search was unlawful. The defendant's conclusory statement that the search was unlawful was insufficient to require the trial court to hold a hearing on his motion. See *State v. Jackson*, 255 Kan. 455, 463, 874 P.2d 1138 (1994) (mere conclusions of a defendant are not sufficient to raise a substantial issue of fact when no factual basis is alleged or appears from the record).

The defendant's court-appointed attorney made no timely objection to the introduction of the evidence seized from the defendant's car at trial. The State argues that in the absence of a timely

objection at trial, the defendant has not preserved this issue for appeal.

A party must make a timely and specific objection to the admission of evidence at trial in order to preserve the issue for appeal. K.S.A. 60-404 states that a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection. See *State v. Peckham*, 255 Kan. 310, 327, 875 P.2d 257 (1994); *State v. Johnson*, 255 Kan. 252, 254, 874 P.2d 623 (1994). By failing to make a contemporaneous objection at trial, the defendant failed to preserve this issue for appeal.

The defendant asserts, without discussion, that his counsel's failure to object to the evidence at trial constituted ineffective assistance of counsel. The issue of ineffective assistance of counsel is raised here for the first time on appeal by appellate counsel. The defendant's appellate counsel filed a motion to remand the case to the trial court for a determination of the ineffective assistance of counsel issue, but not until October 17, 1995, only 1 week before oral argument and more than 4 months after the appellate brief mentioning the issue was filed. Because the defendant's appellate counsel did not timely seek a remand, this court denied the motion to remand on October 18, 1995.

In *State v. Van Cleave*, 239 Kan. 117, 118-19, 716 P.2d 580 (1986), this court held that an allegation of ineffective assistance of counsel will not be considered for the first time on appeal. The *Van Cleave* court pointed out that the principal problem facing an appellate court when a claim of ineffective assistance of counsel is raised for the first time on appeal is that the trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than is an appellate court in reviewing the issue for the first time from a cold record. Many times what would appear in the record as an indication of ineffective counsel was fully justified under the circumstances present in the trial court. The trial judge should be the first to make a determination of such an issue.

If ineffective assistance of counsel is not apparent from a cold reading of the record on appeal, this court will not reach the issue for the first time on appeal. The *Van Cleave* court recognized two remedies where an ineffective assistance of counsel claim arises for the first time on appeal. One remedy is via a K.S.A. 60-1507 motion in the trial court. The second option, where new counsel enters the case after the appeal is filed, is for the defendant to seek a remand from the appellate court to the trial court for determination of that issue. 239 Kan. at 119-21. Because the defendant's motion to remand was untimely, this court will not reach the issue on appeal.

## EVIDENCE OF OTHER CRIMES AND BAD ACTS

The defendant asserts that evidence of his drug abuse, child abuse, and prior crimes of car theft or car tampering should not have been admitted at trial. The defendant did not object to any of this evidence at trial. His failure to lodge a contemporaneous objection at trial precludes him from raising the issue on appeal. See K.S.A. 60-404; *Peckham*, 255 Kan. at 327; *Johnson*, 255 Kan. at 254.

The defendant suggests that his objection to marital discord evidence at the appeal stage is sufficient to preserve this issue for appeal because the evidence of drug and child abuse and prior crimes was admitted through the marital discord witnesses. The contemporaneous objection rule requires that the specific ground of objection be stated at the time of the objection. K.S.A. 60-404. An objection to marital discord evidence does not preserve an objection to evidence of drug and child abuse and prior crimes. The defendant has not preserved this issue for appeal.

The defendant also suggests that if his failure to object at trial is a bar to an appeal on this issue, then he received ineffective assistance of counsel at trial. Again, the defendant raises the ineffective assistance of counsel for the first time on appeal, and his request to remand the case to the district court for determination

of the issue was not timely. We do not reach the issue of ineffective assistance of counsel.

Affirmed.