No. 71,697

STATE OF KANSAS, *Appellee,* v. ROBERT SHERRER, *Appellant.*
(912 P.2d 747)

Opinion filed March 8, 1996.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Julie McKenna*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his jury conviction of first-degree murder. Defendant claims the trial court erred in: (1) threatening trial counsel with contempt; (2) limiting cross-examination; (3) refusing to admit evidence of the victim's blood alcohol concentration and the defendant's alcohol dependence; and (4) admitting gruesome photographs. Defendant also claims cumulative trial errors require reversal of his conviction.

Defendant Robert Sherrer was charged with first-degree premeditated murder in the May 16, 1993, shooting death of Steven Lantz. Sherrer separated from his wife, Susan, approximately a month before Lantz' death. Sherrer's alcohol and drug use contributed to the breakdown of their marriage. When they separated, Sherrer moved into a house across the street from where he had lived with Susan. The shooting occurred at Susan's house.

Sherrer and Steven Lantz, the victim, were best friends and thought of each other as "brothers." Sherrer had told Lantz that he could have a beer with Susan but not sex.

Around 5:30 p.m. on May 15, 1993, Lantz and Susan took Susan and Sherrer's two children (Jake and Matthew) and two neighborhood children fishing. They returned to Susan's around 9:30 p.m. Jake was put to bed in Susan's bedroom around 10:30, and Matt

watched television. Susan and Lantz sat in the kitchen talking and drinking beer.

Sherrer had slept that afternoon and had had dinner with his friend Carol, who lived with him, and his nephew, Brian. Around 10:30 p.m. Sherrer went to Susan's to get a tool from the garage. Sherrer was in a happy mood and did not appear to have been drinking. He stayed around ½ hour and drank some beer with Susan and Lantz. Sherrer inquired why Lantz was wearing Susan's t-shirt, and Lantz explained that his shirt had gotten wet in the rain. After Sherrer left, Susan and Lantz discussed the fact that Sherrer had not become angry.

Around 11:00 p.m. Sherrer and Brian went to a bar and then to a friend's house. Sherrer consumed a number of beers and a shot of tequila. A short time after they returned home, Brian discovered that Sherrer had left the house.

Sherrer returned to Susan's around 1:30 a.m. Susan and Lantz were sitting at the kitchen table. Sherrer was intoxicated and filled with rage at Lantz' presence. Sherrer accused Lantz and Susan of sleeping together. Susan argued with Sherrer for a couple of minutes and then told him to leave. When Lantz attempted to calm Sherrer down, Sherrer kicked a gun cabinet, breaking it. Susan ran to her bedroom to dial 911. Sherrer followed her to the bedroom and smashed the telephone. Susan then woke Jake, told Matt to follow her, and left the house. As Susan was knocking on a neighbor's door, she heard two gunshots at her house followed by several more shots.

Matt remained in the house and witnessed the shooting. He testified as follows: When his mother asked his father to leave, his father kicked in the gun cabinet. His mother ran down the hallway. His father picked up a pistol and followed his mother; there was no clip in the gun. When his mother left with Jake, his father chased them, stopped at the gun cabinet, and put a clip with bullets in the gun. His father went outside the house onto the porch. Lantz was by the door telling his father not to chase his mother. His father fired a shot. Matt told Lantz to call the police, but Lantz replied that he had been shot in the leg. As Lantz came toward Matt, Sherrer shot at Lantz. The bullet went through the couch where

Matt was sitting, through the wall, and into the garage. Lantz went down the hallway, and his father followed. Matt heard another shot and saw Lantz fall against the wall. Lantz went into Matt's bedroom. Matt heard another shot. His father then came out of the bedroom, put the pistol back, picked up another gun, left the house, and went across the street. Matt went to his bedroom and saw blood and Lantz on the floor. When Lantz did not get up, Matt thought Lantz was dead and ran to the neighbor's house.

Neighbors heard the gunshots. One neighbor saw Sherrer run from Susan's house. Sherrer said, "He's dead, he's dead," or "She's dead." Sherrer returned to where he was staying and stated to Brian that he had just shot his best friend and had one bullet left for himself. Sherrer was talked out of shooting himself. Brian took the gun from Sherrer and threw it out of Sherrer's bedroom window. Sherrer was arrested sitting in a van parked outside the house.

Sherrer testified that he remembered only portions of May 15-16, 1993. He recalled that he began drinking beer early in the morning and also drank a bottle of Jack Daniels. Sherrer did not know when he stopped drinking but remembered that he awoke around 5:30 p.m., ate dinner, went to Susan's house where he consumed 3-4 beers, went to the bar with Brian where he drank beer and tequila, and then went to his friends' house, where he drank beer. Sherrer recalled going home and then going back to Susan's house and having a heated conversation with her. Sherrer testified that Susan said, "Oh, your timing's all screwed up because I was just getting ready to do Steve," which Sherrer interpreted to mean they were going to have sex. The next thing Sherrer remembered was being across the street at his house and pointing a gun to his head. Brian took the gun. Sherrer's next memory was of being in a van and the police taking him out of the van and handcuffing him. Sherrer did not remember breaking the gun cabinet, loading the weapons, or shooting Lantz.

Lantz suffered three gunshot wounds. Evidence showed that the first shot, a .9 mm bullet, went through Lantz' left leg as he stood in the doorway. The second shot was a flesh wound through the right side of Lantz' chest from back to front. This bullet, also a .9 mm, after traveling through Lantz' chest, went through the

couch and wall and lodged in the garage. In addition to these bullets which hit Lantz, officers found several live rounds from the .9 mm gun outside and inside the house. This meant that the gun either misfired or jammed. This gun was found near the broken gun cabinet. The final and fatal wound, a shot to the back of Lantz' head, was fired from a .357 revolver. The bullet lodged behind Lantz' left eye. The pistol which fired that bullet was found outside Sherrer's house under Sherrer's bedroom window. A neighbor testified that he had (before the shooting) unloaded several guns in the cabinet, including the .9 mm and possibly the .357.

Sherrer was convicted of first-degree premeditated murder. After the jury was unable to reach a verdict on the prosecutor's request to impose the hard 40, Sherrer was sentenced to life imprisonment with parole eligibility in 15 years. Sherrer appeals.

## THREATENING DEFENSE COUNSEL

The defendant's trial counsel, Mark Dinkel, sought to introduce evidence of the presence of alcohol or drugs in the victim's blood and urine. During cross-examination, Dr. Macy, the pathologist, testified that he sent samples of the victim's blood and urine to the KBI for alcohol and drug screens. The pathologist testified that he had received reports of those tests. The prosecutor objected to the reports' admission because the pathologist had not performed the tests and because the results were irrelevant. After the court sustained the State's objection, the following exchange occurred:

"MR. DINKEL: Your Honor, I do have the person who performed—I believe if I could see those again, I have the person who performed the tests subpoenaed.

"THE COURT: Very well. I mean, you can have that person testify to them.

"MR. DINKEL: As far as—if I can approach the bench.

"THE COURT: I sustained the objection. He [the pathologist] didn't have anything to do with these tests.

"MR. DINKEL: I would like to make a record on something.

"THE COURT: Well, the objection's been overruled.

"MR. DINKEL: I would say—

"THE COURT: No. No, you don't. The objection's been sustained. Proceed with your—

"MR. DINKEL: I think I need to make a record as far as something here goes. I have not—

"THE COURT: Excuse me.

"MR. DINKEL: Your Honor, I would just like for the record to show—

"THE COURT: Mr. Dinkel, if you say one more word about that document right there, I'm going to hold you in contempt of court. I've ruled that the objection is sustained. Proceed with your examination. You can make your record which you proffered up here at the bench some other time. It does not have to be made now. It doesn't have anything to do with this witness."

Later, outside the presence of the jury, defense counsel made a proffer by informing the court that he had not been provided a KBI toxicology report and that he was able to subpoena the toxicologist and could only introduce the contents of the report through the testimony of the pathologist. The trial court found the toxicology report was beyond the scope of the prosecutor's direct examination of the pathologist and suggested that defense counsel subpoena the pathologist as a defense witness. The prosecutor, who had also not seen the report, argued that the presence of drugs or alcohol in the victim's system was irrelevant because there was no evidence the victim was an aggressor. The trial court agreed and found that results of the toxicology report were irrelevant.

Just prior to the close of the defendant's case in chief, defense counsel informed the court that a witness from the KBI would testify that Lantz' blood alcohol concentration was .27. Defense counsel contended this evidence was relevant to show that everybody involved in the shooting was intoxicated that night and that under these circumstances, an argument or quarrel could have developed between the victim and the defendant. The prosecutor argued that the blood alcohol concentration was irrelevant because there was no evidence of an altercation between the defendant and Lantz or that Lantz was incapacitated or affected by the alcohol. The court noted that there was no expert testimony as to the effect of a .27 blood alcohol concentration and again ruled that Lantz' blood alcohol concentration was irrelevant.

The defendant first argues that the trial judge committed judicial misconduct by threatening to find his counsel in contempt when counsel sought to approach the bench. He contends the judge's comments and actions reflected poorly on his trial counsel, made his counsel appear to the jury as unscrupulous and disruptive, and had a detrimental effect on his right to a fair trial. The defendant

asserts that in asking to approach the bench his counsel was attempting to proffer evidence outside the presence of the jury. He points out that it was only after the trial court threatened contempt that the trial court informed his counsel a proffer could be made at a later time.

"Allegations of judicial misconduct during trial must be decided on the particular facts and circumstances surrounding such alleged misconduct. In order to warrant or require the granting of a new trial, it must affirmatively appear that the conduct was of such a nature that it prejudiced the substantial rights of the complaining party. A mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment. If a proper and reasonable construction will render the remark unobjectionable, the remark is not prejudicial." *State v. Gadelkarim*, 256 Kan. 671, Syl. ¶ 1, 887 P.2d 88 (1994).

See *State v. Thomas*, 252 Kan. 564, 570, 847 P.2d 1219 (1993).

The defendant asserts that it was clear his trial counsel was trying to make a proffer and that when the trial judge denied counsel's request to proffer the evidence, defense counsel was forced to attempt to make that record in the jury's presence. He cites *State v. Hodges*, 241 Kan. 183, Syl. ¶ 3, 734 P.2d 1161 (1987), where this court stated that it is error to refuse a proffer when expert testimony is excluded.

When an objection to a question propounded to a witness is sustained, the party may make an offer of what he or she expects the answer to prove. K.S.A. 60-243(c). A verdict cannot be set aside or a judgment reversed based on the erroneous exclusion of evidence unless the party seeking to admit the evidence has made known the substance of the evidence. K.S.A. 60-405. Thus, a party who is trying to preserve a record for appeal must be permitted to proffer any excluded evidence, not just expert testimony. There is, however, no requirement that the proffer be made at the precise time the testimony or evidence is excluded.

"The trial judge is not merely a moderator, but is the governor of the trial. The judge must strive to have the trial conducted in an atmosphere of impartiality and should refrain from remarks or conduct that may injure a litigant." *State v. Hamilton*, 240 Kan. 539, Syl. ¶ 3, 731 P.2d 863 (1987). In maintaining order during a trial, the trial judge may control the time at which a proffer is made.

Delaying a proffer until the end of the pathologist's testimony here was not unreasonable.

When the judge sustained the prosecutor's objection, defense counsel's request to approach the bench was denied. Defense counsel then sought four times in the presence of the jury to make additional comments concerning making a record, but at no time did counsel indicate to the judge that the record he wanted to make was a proffer. It was only after the trial judge's attempts at controlling defense counsel failed three times that the judge threatened contempt. We agree that the threat of contempt might have been unnecessary had the trial judge earlier informed defense counsel he could make his record at a later time. However, the defendant has not shown that the threat of contempt prejudiced his substantial rights such that a new trial is required. Under the circumstances, the trial judge's threat of contempt did not constitute judicial misconduct requiring a new trial.

## CROSS-EXAMINATION

The defendant also argues that the trial court erred in refusing to permit defense counsel to cross-examine the pathologist concerning the results of the KBI toxicology report discussed above. He notes that the trial judge initially excluded the evidence because the pathologist had not conducted the tests (*i.e.* hearsay) and because the results of the toxicology report were irrelevant. The defendant asserts that the blood alcohol report would show a high level of intoxication that could have affected the victim's state of mind and could have raised the possibility of provocation by the victim or sudden quarrel between the defendant and the victim. The defendant argues that this possibility required the jury to be instructed on the lesser included offense of voluntary manslaughter.

"Evidence" is the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals and includes testimony in the form of opinion and hearsay. "Relevant evidence" means evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(a), (b). The object of evidence is to inform the trier of fact of the material facts which

are relevant as bearing upon an issue. Inferences of fact are permitted only when, and to the extent that, logic and human experience indicate a probability that certain consequences can and do follow from the base events or conditions. Evidence of matters that are wholly irrelevant and that are incapable of affording any legitimate proof, presumption, or inference regarding the fact or facts in issue are to be excluded from consideration by the trier of fact.

If the toxicology report revealed that Lantz had used alcohol and/or drugs prior to his death, and the extent of that use, that evidence was not relevant. Susan Sherrer testified that Lantz had been drinking beer, and when asked whether Lantz appeared to be intoxicated, she stated, "No more so than usual." However, she also testified that Lantz did not start a fight with the defendant. The defendant himself testified, at least concerning what he could remember of the incident, that Susan shoved and pushed him, not Lantz. Moreover, although there was evidence that the defendant became loud, angry, irrational, and enraged when intoxicated, there was no evidence that Lantz became aggressive or was likely to start a fight when intoxicated. Although the defendant argues that Lantz' intoxication was relevant to the issue of provocation or sudden quarrel, there is no evidence Lantz provoked or fought with the defendant. In the absence of evidence that the victim provoked the defendant or that he was likely to provoke when intoxicated or under the influence of drugs, evidence of the level of the victim's drug or alcohol from the KBI toxicology report was not relevant and was properly excluded by the trial judge.

## OTHER EXCLUDED EVIDENCE

Sherrer and various witnesses testified that Sherrer consumed alcohol frequently or daily. There was uncontroverted evidence that when drinking, Sherrer became loud, angry, irrational, or obnoxious. Sherrer testified to the jury that after his separation from Susan he was never sober and that he used cocaine intravenously. Sherrer testified that he had participated in drug and alcohol treatment in 1984 and had stopped using drugs and alcohol for a while. He informed the jury that he had experienced blackouts when using alcohol. To corroborate the fact he had previously experi-

enced blackouts, the defendant sought to introduce the testimony of Judy Weber, a substance abuse counselor. Weber would have testified that when she counseled the defendant a decade earlier, the defendant was alcohol dependent and had informed her that he experienced blackouts from his use of alcohol. The trial court rejected the testimony for remoteness.

In the recent case of *State v. Cheeks*, 258 Kan. 581, 908 P.2d 175 (1995), this court addressed the remoteness of evidence. Where the fact or facts proposed to be established as a foundation from which an inference may be drawn do not have a visible, plain, or necessary connection with the proposition eventually to be proved, such evidence is excluded for remoteness. However, lapse of time may not be sufficient to deprive evidence of its value but goes to the weight of the evidence, which is for the jury to determine. Whether evidence is too remote to be admissible rests within the sound discretion of the trial court. 258 Kan. 581, Syl. ¶¶ 2, 3.

In *State v. Hedger*, 248 Kan. 815, 820, 811 P.2d 1170 (1991), this court held that a five-year lapse of time was not too remote because there was a connection between prior instances of abuse and the events of abuse immediately before the victim's death. In *Hedger*, the prior abuse was related to the defendant's alcoholism, and he had resumed drinking shortly before the victim's death. Here, the evidence the defendant sought to admit through Judy Weber was 10 years old. The defendant testified that his drinking habits changed for a while following his participation in treatment in 1983. Weber's testimony that the defendant experienced blackouts in 1983 was based on the defendant's statements to Weber rather than information Weber received from other sources. Evidence that the defendant had reported experiencing blackouts from alcohol use 10 years earlier had no visible, plain, or necessary connection to his testimony that he experienced a blackout the night he shot the victim. Unlike in *Hedger*, the lapse of time here was sufficient to deprive the evidence of its value. The trial court did not abuse its discretion in excluding Weber's testimony for remoteness.

## ADMITTING GRUESOME PHOTOGRAPHS

The defendant argues that the trial court erred in admitting into

evidence gruesome photographs of Lantz' wounds. The court admitted the photographs of the victim taken during the autopsy. The court instructed the jury as to one of the photographs to disregard the autopsy procedures and confine its consideration of the photograph to the testimony concerning the path of the bullet.

Exhibit 41 is a photograph of Lantz lying on his back with blood on his skin and on the table. One small circle appears to be the entrance of the chest wound, but the exit wound is not very clear. Exhibit 42 is a photograph of Lantz lying on his back during the autopsy after the skin had been cleaned. The chest is opened and there is skin folded to his chin and skin dropping to his side. Lantz' internal organs can be seen, although the camera angle is nearly level with the table. A probe is inserted through the entrance and exit of the chest wound. Exhibit 43 is a photograph of Lantz' head with a portion of his hair shaved. It depicts the bullet wound and has a measuring device held to the area. Exhibit 44 shows Lantz' head with the scalp folded back. Fracturing of the skull is evident, although the bullet wound is not visible. Exhibit 45 is similar to Exhibit 44 but is taken from a different angle. It shows the bullet wound with a probe inserted. Some skull fracturing can also be seen.

The defendant points out that Exhibit 42 is similar to a photograph described by this court in *State v. Boyd*, 216 Kan. 373, 532 P.2d 1064 (1975). In *Boyd*, this court found that the trial court abused its discretion in admitting 14 exhibits offered by the State. We described one photograph as follows: "[E]xhibit 39 show[s] the body of the deceased cut open from chin to groin and laid out like a disemboweled beef in a packing plant. A flap of chest skin partially covers the deceased's face and the chest and abdominal organs of the deceased are presented in full view." 216 Kan. at 377-78. Noting that the cause of death was not in dispute and that some photographs which were admitted showed the angle of penetration of the murder weapon, this court held that the trial court abused its discretion in admitting repetitious photographs taken during the autopsy and especially in admitting exhibit 39. 216 Kan. at 378; see also *State v. Adam*, 257 Kan. 693, 707-08, 896 P.2d 1022 (1995) (reversed and remanded for a new trial; photographs were similar

to the ones disapproved in *Boyd,* there was little or no probative value to the photographs, and the photographs should not be submitted into evidence when the case was retried); *State v. Childers,* 217 Kan. 410, 417, 536 P.2d 1349 (1975) (finding error in admitting gruesome color slides of the deceased's body taken during the autopsy but without describing those slides); but see *State v. Arteaga,* 257 Kan. 874, 887-89, 896 P.2d 1035 (1995) (no abuse of discretion in admitting photograph taken after the skin had been removed from the thoracic cavity of the victim).

The admission of photographs in a homicide case is a matter that lies within the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. Demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. However, photographs taken during the autopsy which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. *State v. Stone,* 253 Kan. 105, 111, 853 P.2d 662 (1993); *State v. Mayberry,* 248 Kan. 369, Syl. ¶ 12, 807 P.2d 86 (1991).

The State argues that the primary purpose of these photographs was to dispute the defense theory that the defendant was acting under the influence of alcohol or lacked premeditation or that the shooting was the result of a sudden quarrel brought on by an intense emotional excitement. The State stresses that the photographs were necessary to demonstrate to the jury that the defendant first shot Lantz in the leg, then in the chest, and finally in the head.

The cause and manner of death of the victim were not in dispute here. The photographs taken at the scene of death and Exhibit 41 and Exhibit 43 taken during the autopsy were helpful in showing the jury the angle of penetration of the bullets. After reviewing the other photographs, we fail to see the necessity for admitting into evidence repetitious photographs which, in addition to demonstrating the angle of penetration, also showed the effect of the autopsy on the deceased's body. As in *Boyd* and *Adams,* we find that the trial court committed error in allowing the State to introduce into

evidence photographs of the deceased taken at the autopsy that were repulsive, inflammatory, without probative value, and highly prejudicial to the defendant's right to a fair trial.

Although the trial court abused its discretion in admitting into evidence Exhibits 42, 44, and 45, we are not required to reverse the defendant's conviction and remand for a new trial. We note that although the *Boyd* court found the trial court erred (1) in failing to instruct on lesser included offenses; (2) in admitting into evidence repetitious, gruesome, and repulsive photographs of the deceased's body taken at an autopsy; and (3) in improperly instructing the jury as to the purposes for which a prior crime could be considered, Boyd's conviction was reversed because a prejudicial instruction was given. Similarly, in *Adam* the error that required a new trial was the court's giving an erroneous instruction to the jury. The *Adam* court found that the admission of the gruesome photographs was error and ordered that the photographs were not to be admitted into evidence when the defendant was retried, but the erroneous admission was not cited as a reason for reversal.

In determining whether a defendant is entitled to have a conviction reversed and be granted a new trial, our rule is that errors which do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Johnson*, 255 Kan. 140, 148, 871 P.2d 1246 (1994). We note that there is no dispute of the fact that the defendant chased, shot, and killed a fleeing victim. In the process of killing the victim, the defendant used two guns, both of which he had to load prior to shooting the victim. The gruesome photographs were improperly admitted, but under the facts of the case we can say that the error in admitting the gruesome photographs did not affirmatively cause prejudice to the defendant's right to a fair trial.

## CUMULATIVE TRIAL ERRORS

Finally, the defendant claims that cumulative trial errors require reversal of his conviction. Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defen-

dant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Castoreno*, 255 Kan. 401, 411, 874 P.2d 1173 (1994); *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

The defendant reasons that because instructions on second-degree murder, voluntary manslaughter, and voluntary intoxication were given by the trial judge, the evidence of his guilt of first-degree murder was not overwhelming. These instructions were given because the defendant was entitled to have the jury instructed on his theory of defense and on any lesser included offenses of which the jury might reasonably convict him. See *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992); *State v. Mitchell*, 234 Kan. 185, 189, 672 P.2d 1 (1983). That the voluntary intoxication and lesser included offense instructions were given does not reveal cumulative error.

The issues set out in the defendant's appeal do not reveal cumulative trial error requiring reversal of his conviction.

Affirmed.