(227 P.3d 978)
No. 100,278 ·

STATE OF KANSAS, *Appellee*, v. RANDALL PENNINGTON, *Appellant*.

Opinion filed March 26, 2010.

*Matthew J. Edge*, of Kansas Appellate Defender Office, for appellant.

*Casey Meyer*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Steve Six*, attorney general, for appellee.

Before McANANY P.J., GREEN and MALONE, JJ.

GREEN, J.: Randall Pennington appeals from a jury conviction of second-degree intentional murder. Pennington raises five issues on appeal. First, he argues that his statutory speedy trial rights were violated. We disagree. Although the trial court erred when it failed to reschedule Pennington's trial within the 90-day period under K.S.A. 22-3402(3), Pennington had previously waived his statutory speedy trial rights. In addition, he acquiesced in the continuance which exceeded the 90-day limited under K.S.A. 22-3402(3). Second, Pennington argues that the trial court abused its discretion in excluding the results of the victim's autopsy report, which showed that he had both marijuana and cocaine in his system when he died. We disagree. There was no showing that the decedent would become violent or the aggressor after having ingested marijuana or cocaine or both.

Third, Pennington argues that the trial court clearly erred when it failed to instruct the jury on the lesser included offense of involuntary manslaughter. Because his actions in striking the decedent were intentional, Pennington was not entitled to such an instruction. Fourth, Pennington argues that the trial court erred in furnishing the jury with a deadlock jury instruction before deliberation. We agree; however, we determine that the instruction was harmless. Finally, Pennington argues that these cumulative errors deprived him of his right to a fair trial. We disagree. Accordingly, we affirm.

In December 2006, Pennington resided in a townhome on North 51st Terrace, Wyandotte County, Kansas. At the time, Monica James, Allan Soverns, Jr. (Monica's boyfriend), and Daethon (Monica's 4-year-old son) also resided in the townhome. Lavirgil DeShawn Jones, the victim in this case, lived nearby. Jones was welcome in the townhome and would often bring his daughter to play Play Station video games with Daethon.

James, Soverns, and Jones made a deal in which Jones would give James and Soverns a Vision card in exchange for one-half of the value in cash. A Vision card is a debit card that can be used to pay for groceries in lieu of traditional forms of food stamps. A few days before December 16, 2006, James withdrew and presented Jones with the money promised under the deal. Nevertheless, despite promises on two occasions, Jones never delivered the Vision card to James and Soverns.

After the Vision card deal failed for a second time, James and Soverns were frustrated and believed that Jones was hustling them. James and Soverns eventually discussed the situation with Pennington; Pennington promised to talk with Jones in an attempt to recover the money. After talking to Jones, Pennington recovered some of the money. Pennington, James, and Soverns decided that after the Vision card incident, Jones was no longer welcome in the townhome.

Around 11 a.m. on December 16, 2006, Jones came to the townhome and apologized about the Vision card incident. At that time, Pennington, James, and Soverns were all in the townhome. James and Soverns were still upset about being cheated in the Vision card deal; they expressed these sentiments to Jones. Soverns told Jones that he was no longer welcome in the home. When Jones refused to leave, Soverns picked up a baseball bat and charged towards Jones as Soverns yelled at Jones to get out of the townhome. In response, Jones threatened to conduct a drive-by shooting on their home. Specifically, James recalled Jones making the following threat: "He said that A.J. better watch himself and that he could have our house shot up, so we better watch that little boy." Jones then left the home, and none of these threats ever materialized.

Later that day, James, Soverns, Pennington, and Daethon decided to travel to Fort Scott, Kansas, to visit Soverns' mother. When the four left the townhome, Jones yelled at Soverns to apologize for the Vision card deal. Moreover, Jones promised to look after the townhome while the group was out of town.

Around 7 to 8 p.m., the group returned home from Fort Scott. When they walked into the home, they saw that their back window had been pried open. They further noticed that their Play Station

and several games were missing from the home. James also noted that her jewelry box had been opened. Almost immediately, James, Soverns, and Pennington suspected that Jones had committed the break-in. James called the police to report the break-in. Frustrated, Soverns went outside the home and began yelling and banging the baseball bat on the ground.

In all the commotion, Jones came to the townhome and began to speak with Soverns. When confronted about the break-in, Jones opined that the items had been stolen by a driver of a black truck, which Jones had seen backing up in the townhome's driveway. After learning this information, Soverns went and spoke to another neighbor. The neighbor verified that the black truck belonged to her relatives, who often used the townhome's driveway to back up. She also revealed that while the group was gone, she had seen Jones walking towards the townhome and knocking on the front door.

When Soverns returned to the townhome, he told James and Pennington about the conversation he had with the neighbor. Jones was still present. Soverns, James, and Pennington wanted Jones to stay at the townhome so that police could interview him when they arrived.

Jones made a comment that he would get James, Soverns, and Pennington a gun for their self-protection. Jones then stood up and told them that he was going home and that the police could find him there if they wanted to talk to him.

Then, Pennington came up behind Jones and started hitting him with the baseball bat. When Pennington initially hit Jones on the head, Jones fell to the ground but attempted to get back up. When he did, Pennington hit him again and Jones fell into the coffee table. Pennington continued to hit Jones several more times with the bat while Soverns watched. At one point, Soverns heard Jones gargling on his own blood; even then, Pennington hit Jones again with the bat. After Pennington hit Jones for the last time, Pennington checked Jones' pulse and stated, "Oh, my God, he's dead."

During the entirety of the incident, Jones never attempted to defend himself. In fact, he still had his hands in his pocket when

the attack occurred. Before the incident, Jones had never made any threats or brandished any weapons.

After the incident, Pennington asked Soverns to kick in the townhome's front door so that it would appear that Jones had broken in at the home. Soverns did so. When police officers arrived at the scene, James, Soverns, and Pennington lied to the officers, stating that Jones had attempted to break in at the townhome. Nevertheless, Soverns later recanted his oral statements to police and told the police what had actually happened at the townhome.

Pennington was interviewed regarding the incident. During the interview, Pennington admitted to hitting Jones multiple times on the head with a baseball bat because he felt threatened by Jones.

The autopsy of Jones' body revealed that the cause of his death was blunt trauma to the head. In addition, the autopsy revealed two large tears in Jones' scalp, skull fractures on the front and back of his head, as well as bruising and internal bleeding in the brain. The forensic pathologist determined that these injuries were caused when Jones was hit at least two times by an object and that these injuries were consistent with being hit by a baseball bat.

In January 2007, the State charged Pennington with one count of first-degree murder, an off-grid person felony, under K.S.A. 21-3401. Initially, Pennington's trial was set for May 21, 2007. Nevertheless, before trial, Pennington's counsel (William Dunn) moved to withdraw due to Pennington's failure to "satisfy his contractual obligation to counsel." The trial court allowed Dunn to withdraw and appointed Rebecca Brock as new counsel for Pennington. When Brock was appointed, she told the court that she could not be prepared for trial by the May 21, 2007, trial date and requested a continuance. Brock stated that Pennington desired the continuance and would waive his speedy trial rights so that Brock could "be fully prepared and we can have an opportunity to review the case together." After listening to Brock's comments, the trial court confirmed with Pennington personally that he desired the continuance and agreed to waive his speedy trial rights. The State had no objection to a continuance of the proceedings as long as Pennington waived his speedy trial rights. The trial court memorialized Pennington's speedy trial waiver in a journal entry.

During a pretrial conference on May 18, 2007, the trial court scheduled Pennington's trial for September 17, 2007. Shortly before trial, on September 13, 2007, Pennington moved to dismiss the charges against him for violation of his statutory and constitutional rights to a speedy trial. In the motion, Pennington argued that although he waived his speedy trial rights at the preliminary proceeding, the waiver was not unconditional but only given in order to secure a continuance necessary for the preparation of his defense. Pennington further argued that although he requested the continuance, K.S.A. 22-3402(3) required that his trial be rescheduled within 90 days of the original trial deadline. Pennington argued that he was entitled to be brought to trial by August 22, 2007 (90 days from the original trial date of May 21, 2007). The trial court denied Pennington's motion to dismiss.

On September 17, 2007, Pennington's 3-day jury trial began. During the jury instruction conference, Pennington's counsel asked about the necessity of an instruction on involuntary manslaughter but never explicitly requested the instruction or objected to its omission. The trial court furnished jury instructions on the crimes of first-degree premeditated murder, second-degree intentional murder, and voluntary manslaughter. In relevant part, the trial court also provided jury instructions on self-defense/defense of another as well as a deadlocked jury instruction.

The jury acquitted Pennington of first-degree murder but convicted him of second-degree intentional murder. The trial court sentenced Pennington to the standard presumptive sentence of 155 months' incarceration.

*Did the Trial Court Err in Denying Pennington's Motion to Dismiss for Violation of His Statutory Speedy Trial Rights?*

Pennington first argues that the trial court erred in denying his motion to dismiss under the speedy trial statute. While Pennington acknowledges that he requested a continuance after his first counsel withdrew, he argues that his case should nonetheless be dismissed for speedy trial violations because the trial court failed to reschedule his trial in a timely fashion. The State argues that the

trial court properly denied Pennington's motion to dismiss because Pennington waived his speedy trial rights.

Pennington's allegation of error requires this court to consider whether his right to a speedy trial, as contemplated by K.S.A. 22-3402, was violated. The question of whether a defendant's statutory speedy trial right has been violated is a question of law over which this court exercises unlimited review. *State v. Adams*, 283 Kan. 365, 367-68, 153 P.3d 512 (2007).

Every person accused of a crime has a constitutional and statutory right to a speedy trial under the Sixth Amendment to the United States Constitution and Section 10 of the Bill of Rights of the Kansas Constitution. *State v. Montes-Mata*, 41 Kan. App. 2d 1078, 1080-81, 208 P.3d 770 (2009). Kansas has adopted K.S.A. 22-3402 to define and implement these constitutional guaranties to a speedy trial. 41 Kan. App. 2d at 1081. Pennington's argument for a speedy trial violation is drawn primarily, if not exclusively, from subsections (1) and (3) of K.S.A. 22-3402:

"(1) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5)."

"(3) If any trial scheduled within the time limitation prescribed by subsection (1) or (2) is delayed by the application of or at the request of the defendant, the trial shall be rescheduled within 90 days of the original trial deadline."

The State bears the responsibility for ensuring that a defendant receives a speedy trial; a defendant need not "take any affirmative action to ensure that his or her right to a speedy trial is observed." *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007). Nevertheless, when a defendant requests or acquiesces to a continuance, the defendant waives his or her statutory right to a speedy trial. *State v. Brown*, 283 Kan. 658, 662, 157 P.3d 624 (2007); see *Adams*, 283 Kan. at 370. Although a defendant waives his or her statutory speedy trial right upon requesting a continuance, a defendant may condition or revoke this waiver and later reassert his or her speedy trial right if the State is aware of the conditions of the

revocation. *State v. Mitchell*, 285 Kan. 1070, 1082, 179 P.3d 394 (2008).

To help understand Pennington's argument, we will examine the timeline of significant events between his arraignment and trial:

| | |
|---|---|
| February 23, 2007 | Pennington was arraigned. |
| May 4, 2007 | Pennington's defense counsel moved to withdraw; Pennington requested a continuance so that he could review his case with substitute counsel and so that substitute counsel could be fully prepared to represent him; Pennington waived his speedy trial rights to accomplish that purpose. |
| May 18, 2007 | Pretrial conference was held where new trial date was set for September 17, 2007. |
| May 21, 2007 | Original trial date (postponed when defense counsel withdrew and case was continued). |
| May 24, 2007 | Original 90-day trial deadline. |
| August 22, 2007 | 90 days after original 90-day trial deadline (K.S.A. 22-3402[3]). |
| September 17-20, 2007 | Pennington's jury trial. |

Initially, Pennington's trial was set for May 21, 2007, within the 90-day time limit from arraignment. Nevertheless, before trial, Pennington's initial counsel moved to withdraw. At the same hearing, the trial court appointed Brock as new counsel for Pennington. When Brock was appointed, she told the court that she could not be prepared for trial by the May 21, 2007, trial date and requested a continuance. After listening to Brock's comments, the trial court verified that Pennington personally desired the continuance and wanted to waive his speedy trial rights:

"THE COURT: All right. Mr. Pennington, you are aware that you have a right to have this trial within 90 days after you were bound over on these charges, do you understand that?

"THE DEFENDANT: Yeah.

"THE COURT: And that by switching attorneys, your new attorney feels that she is not able to get prepared in time to commence trial on May 21st, do you understand that?

"THE DEFENDANT: Yes.

"THE COURT: And so you are requesting to continue the trial setting, and in order to do it for the record, we need you to waive your right to speedy trial, do you understand?

"THE DEFENDANT: Yes."

After Pennington's waiver, the trial court set the case for pretrial conference on May 18, 2007. Then the trial court set Pennington's trial for September 17, 2007.

Based on the timeline and this court's decision in *State v. Lawrence*, 38 Kan. App. 2d 473, 167 P.3d 794 (2007), *rev. denied* 286 Kan. 1183 (2008), Pennington's September 17, 2007, trial date was scheduled 26 days after August 22, 2007, which date would have been 90 days after the original 90-day trial deadline under K.S.A. 22-3402(3). See *State v. Brown*, 283 Kan. 658, 667, 157 P.3d 624 (2007):

"[K.S.A. 22-3402(3)] requires the trial to be rescheduled within 90 days of the 'original trial *deadline*,' not the 'original trial *date*,' which is the term used in K.S.A. 2006 Supp. 22-3402(5)(c) (formerly [3][c]), relative to prosecution extensions. See L. 2004, ch. 47, sec. 1. This difference is significant and is not inconsistent with the result we reach herein. The 90-day clock continues to run unless there is a delay as a result of the application or fault of the defendant which stops the clock. When delay is caused by the prosecution, the time for trial may be extended if the reason therefor is within one of the statutory grounds therefor. *The new subsection is aimed placing a duty on the court and the State to restart the speedy trial clock which has been stopped by the application or fault of the defendant and to reset the trial date within a specific time period.* This new provision does not affect the issue before us." (Emphasis added.)

Of course, this would constitute a violation under K.S.A. 22-3402(3) because it would seem that our Supreme Court has interpreted the 90-day period under that subsection as requiring the court and the State to restart the speedy trial clock. Thus, if the trial court did not set the trial within the 90-day period under K.S.A. 22-3402(3), the additional days could possibly count against the State and not against the defendant.

We guardedly use the word "could" in the previously mentioned paragraph because K.S.A. 22-3402(3) is silent as to a remedy for

violating this subsection. Indeed, *Lawrence* points out this uncertainty:

"We have assumed for the purposes of this analysis that the requirement of subsection (3) [of K.S.A. 22-3402] is a mandatory speedy-trial rule, not a directory one. But that is not at all clear from the language of the statute. Subsections (1) and (2) contain an explicit penalty for noncompliance: the defendant 'shall be entitled to be discharged from further liability to be tried for the crime charged.' Subsection (3) does not contain any language providing a consequence for noncompliance." 38 Kan. App. 2d at 483.

As *Lawrence* points out, there is no penalty contained in subsection (3) of K.S.A. 22-3402, while there is an explicit penalty of "such person shall be entitled to be discharged from further liability to be tried for the crime charged" when there is a violation of the speedy trial rights in K.S.A. 22-3402(1) and (2). If the 90-day deadline in K.S.A. 22-3402(3) is directory rather than mandatory, a violation of that subsection would not warrant dismissal of the charges against a defendant.

Nevertheless, because Pennington waived his statutory speedy trial rights, we do not need to decide whether a K.S.A. 22-3402(3) violation should be counted against the State in determining whether a statutory speedy trial violation has occurred under K.S.A. 22-3402(1). Presumably, Pennington meant to waive his speedy trial rights under K.S.A. 22-3402(3) because it was the only relevant statutory speedy trial right implicated by his request for a continuance. To illustrate, because Pennington made the request for a continuance, the 90-day speedy trial deadline under K.S.A. 22-3402(1) would have been tolled. See K.S.A. 22-3402(2); *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009) ("[D]elays that result from the request of a defendant toll the statutory speedy trial period."). As a result, there would have been no violation of K.S.A. 22-3402(1). "A defendant waives his or her right to a speedy trial under the statute if he or she requests a continuance or files a motion that delays the trial beyond the statutory deadline." 288 Kan. at 144.

In addition, although Pennington argues that he did not understand he was waiving all of his speedy trial rights and that he requested a continuance for limited purposes, the record indicates

that Pennington acquiesced in the September 17, 2007, trial setting. Defense counsel was present at the pretrial conference when the September 17, 2007, trial date was set. Moreover, Pennington never objected to the trial setting until September 13, 2007, which was 22 days after the 90-day deadline under K.S.A. 22-3402(3). In *Vaughn,* our Supreme Court stated that "a defendant's waiver of the right to a speedy trial extends not only to a defendant's request for a continuance but also is effected by a defendant's 'acquiescing in the grant of a continuance.' [Citations omitted.]" 288 Kan. at 144.

The evidence in the record conclusively establishes that on May 4, 2007, Pennington requested a continuance to prepare his defense with new counsel. Moreover, he personally waived his statutory speedy trial rights. Because there is no evidence in the record that this waiver was conditional or was later revoked, Pennington is precluded from asserting that his statutory speedy trial rights were violated. As a result, Pennington's argument fails.

*Did the Trial Court Err in Excluding Evidence of the Victim's Autopsy Report?*

Pennington's next argument on appeal is that the trial court impermissibly impaired his right to present his defense by refusing to permit introduction of Jones' autopsy report. To the contrary, the State argues that the trial court properly excluded this evidence because it was irrelevant.

When reviewing a trial court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless prohibited by statute. *State v. Riojas,* 288 Kan. 379, 382, 204 P.3d 578 (2009). Evidence is relevant if it has any "tendency in reason to prove any material fact." K.S.A. 60-401(b). Thus, in order for any type of evidence to be considered relevant, it must be probative to establishing some material fact (that is, a fact significant under the substantive law of the case). *State v. Vasquez,* 287 Kan. 40, 49-50, 194 P.3d 563 (2008); *State v. Reid,* 286 Kan 494, 504-05, 186 P.3d 713 (2008). The standard of review for whether evidence is material is de novo. 286 Kan. at 505. The standard of review for

whether evidence is probative is reviewed under the abuse of discretion standard. 286 Kan. at 509. Finally, even if evidence is material and probative, the trial court must decide whether the evidence is unduly prejudicial. The appellate court reviews the determination of whether evidence is unduly prejudicial under the abuse of discretion standard. 286 Kan. at 512.

Once relevance is established, the trial court must then apply the statutory rules governing the admission and exclusion of evidence. These rules are applied either as a matter of law or in the exercise of the trial court's discretion, depending on the rule in question. Therefore, the standard of review that is applicable on appeal will depend upon which rule the court applied to determine the admissibility of the evidence at issue. *Riojas*, 288 Kan. at 383. If an appellate court determines that the trial court erroneously admitted or excluded evidence, an appellate court must then determine whether the error was harmless. *State v. Boggs*, 287 Kan. 298, 318-19, 197 P.3d 441 (2008). To determine whether such an error was harmless or prejudicial, each must be scrutinized in the light of the record as a whole. "Reversal is required only where an erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice." *State v. Garcia*, 282 Kan. 252, 270, 144 P.3d 684 (2006).

Generally, a defendant is entitled to present the theory of his or her defense and the exclusion of evidence that is an integral part of that theory violates a defendant's fundamental right to a fair trial. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). Nevertheless, this right is not unlimited, but instead subject to statutory rules and case law interpretation on the rules of evidence and procedure. *State v. Houston*, 289 Kan. 252, 261, 213 P.3d 728 (2009).

In the case at bar, the State filed a motion in limine to suppress evidence of Jones' autopsy report, which showed that he was under the influence of both marijuana and cocaine when he died. In the motion, the State argued that the evidence was irrelevant because Pennington never maintained that he feared Jones because of any drug usage by him but instead stated to police that he feared Jones because he thought he had a weapon. Moreover, the State argued that the evidence would be more prejudicial than probative and

"would only serve to prejudice the victim in the eyes of the jury, suggesting that he was a 'bad' person and that the law should not protect him."

On the other hand, Pennington argued that the evidence was relevant to his self-defense theory. Specifically, Pennington argued that he would present evidence that he was aware of Jones' drug use. Additionally, he argued that such evidence was "relevant to the actions that [Pennington] says the decedent did just prior to what happened, here, and [Pennington] feeling like he needed to defend himself and the others present in the room." Furthermore, Pennington argued that if Jones was jittery when the incident happened, the evidence of the drug usage could explain his conduct. Nevertheless, upon further inquiry by the court, defense counsel admitted that Pennington would not be able to establish that he knew Jones was on drugs when the incident occurred.

Because of the improbability of establishing Pennington's knowledge of Jones' drug use on the day of the incident, the trial court excluded the evidence. Nevertheless, the trial judge allowed Pennington to testify "as to his observations of the behavior of the victim. He can testify what he thought he was on . . . I will allow that as far as the defendant getting into what he observed and what that made him feel or think at that time."

The State likens this case to *State v. Sherrer*, 259 Kan. 332, 912 P.2d 747 (1996). In *Sherrer*, the defendant challenged his conviction for first-degree murder, arguing *inter alia*, that the trial court erred in refusing to admit evidence of the victim's blood alcohol concentration when the incident happened. The evidence during trial tended to show that after finding his wife and best friend sitting and talking at her kitchen table, Sherrer shot and killed his best friend.

During trial, defense counsel attempted to introduce evidence of the presence of alcohol in the victim's blood and urine. The State objected to the admission of the evidence on foundational grounds (that are irrelevant for our purposes) and on grounds of relevancy. Specifically, the State argued that the test results were irrelevant because there was no evidence that the victim was the aggressor or that the victim was incapacitated or affected by alco-

hol. The trial court agreed with the State, excluding the testimony on both foundational and relevance grounds.

Here, the trial court properly excluded the evidence of Jones' drug usage for two reasons. First, there was no evidence showing that Jones was affected or incapacitated by the drugs in his system. Furthermore, even at the preliminary hearing on this matter, Pennington could furnish no evidence that he had knowledge that Jones was under the influence of drugs on the day of the incident. Second, the record contains no evidence that Jones would act violently after ingesting drugs. In fact, the only trial testimony on Jones' demeanor established that even when Jones spoke of procuring a gun for James, Soverns, and Pennington's protection, he acted in a calm manner. Therefore, Jones' usage of drugs had no bearing on Pennington's belief regarding his right to use force to defend himself or others. Absent any evidence in the record that Pennington observed clues regarding Jones' drug usage or that Jones' drug usage caused him to act as an aggressor, this evidence was irrelevant and could not have played into Pennington's decision-making process on the day of the incident. As a result, Pennington's argument fails.

*Did the Trial Court Clearly Err in Failing to Instruct the Jury on the Lesser Included Offense of Involuntary Manslaughter?*

Pennington next argues that the trial court clearly erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter because there was evidence that Pennington committed a lawful act (self-defense) in an unlawful manner (through the use of excessive force). The State urges this court to reject Pennington's argument because, as a matter of law, Pennington was not entitled to act in self-defense. Additionally, the State argues that Pennington intentionally tried to kill Jones and, therefore, an instruction on unintentional killing was inappropriate.

Generally, the trial court has a duty to instruct the jury on all lesser included offenses where there is some evidence that would reasonably justify a conviction of the lesser included offense. This duty to instruct only arises where there is evidence supporting the lesser included crime. Therefore, the trial court has no duty to

furnish a lesser included offense instruction if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. *Houston,* 289 Kan. at 273-74. Nevertheless, a lesser included offense instruction is warranted even if the evidence is weak and inconclusive and may be based upon the testimony of the defendant alone if it tends to show a lesser degree of crime. *State v. Kirkpatrick,* 286 Kan. 329, 334, 184 P.3d 247 (2008); *State v. Bell,* 266 Kan. 896, 915, 975 P.2d 239, *cert. denied* 528 U.S. 905 (1999).

Where a party neither suggests an instruction nor objects to omission, an appellate court reviewing a trial court's failure to give a particular instruction applies a clearly erroneous standard. *State v. Salts,* 288 Kan. 263, 265, 200 P.3d 464 (2009); see K.S.A. 22-3414(3). Jury instructions are clearly erroneous only if the reviewing court is firmly convinced that there is " 'a real possibility the jury would have rendered a different verdict if the error had not occurred.' [Citations omitted.]" 288 Kan. at 265-66.

At trial, the trial court instructed the jury that it could convict Pennington of the following crimes: first-degree premeditated murder, second-degree intentional murder, or voluntary manslaughter. In addition, the trial court gave the jury an instruction on self-defense or defense of another. The trial court did not provide the jury an instruction on involuntary manslaughter. At the jury instruction conference, Pennington neither clearly requested nor objected to the omission of the instruction, although he did ask a question about the validity of such of instruction.

On appeal, Pennington asserts that the trial court should have furnished an instruction of involuntary manslaughter under K.S.A. 21-3404(c). K.S.A. 21-3404 defines involuntary manslaughter as the unintentional killing of a human being committed:

"(a) Recklessly;

"(b) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566 and subsection (a) of 8-1568, and amendments thereto, but excluding the acts described in K.S.A. 8-1567 and amendments thereto; or

"(c) *during the commission of a lawful act in an unlawful manner.*" (Emphasis added.)

A closely related concept for our purposes is K.S.A. 21-3211, which delineates the scenarios when a defendant may use force in defense of himself, herself, or others. K.S.A. 21-3211 provides:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

Under K.S.A. 21-3211, perfect self-defense is a concept based on justification or excuse and operates as a complete defense to a crime. In contrast, imperfect self-defense is based not on justification but rather on mitigation and only reduces a defendant's criminal culpability to a lesser crime. *Kirkpatrick*, 286 Kan. at 339. A defendant's actions in imperfect self-defense (or the defense of others) can result in a conviction for voluntary manslaughter if he intentionally kills a human being based upon an unreasonable but honest belief that circumstances existed that justified deadly force. In the alternative, a defendant's actions in imperfect self-defense can result in a conviction for involuntary manslaughter if he or she unintentionally killed a human being by committing the lawful fact of self-defense in an unlawful manner through the use of excessive force. 286 Kan. at 339.

As a consequence, Kansas appellate courts have repeatedly found that if a defendant lawfully commits self-defense in an unlawful manner (through the use of excessive force), he or she is entitled to an instruction on involuntary manslaughter in accordance with K.S.A. 21-3404(c). *Houston*, 289 Kan. at 271-73; *Kirkpatrick*, 286 Kan. at 335, 339; *State v. Robinson*, 261 Kan. 865, 881, 934 P.2d 38 (1997). Like all other challenges involving lesser included jury instructions, the applicability of such an instruction depends on the evidence of the particular case. *Bell*, 266 Kan. at 914-15.

The applicability of the involuntary manslaughter imperfect self-defense instruction depends on two issues that must be considered by this court. First, this court must consider whether there was evidence that Pennington acted in lawful self-defense. Second, this court must consider whether there is evidence that Pennington intended to kill Jones. If he did, there can be no instruction for involuntary manslaughter, which only covers unintentional killings.

The evidence at trial tended to show that after the parties returned from Fort Scott and discussed the break-in with Jones, Jones made a calm suggestion that he would get James, Soverns, and Pennington a gun for their self-protection. After making the suggestion, Jones then attempted to leave the townhome. Then, Pennington came up behind Jones and started hitting him with the baseball bat. When Pennington hit Jones on the head with the bat, Jones fell to the ground and attempted to get back up. Pennington hit him again and Jones fell into the coffee table. Pennington continued to hit Jones several more times with the bat while Soverns watched. At one point, Soverns heard Jones gargling on his own blood; even then, Pennington hit Jones again with the bat. After Pennington hit Jones for the last time, Pennington checked Jones' pulse and stated, "Oh, my God, he's dead."

During the entirety of the incident, Jones never attempted to defend himself. In fact, he still had his hands in his pocket when the incident occurred. Before the incident, Jones never made any threats or brandished any weapons. Nevertheless, James testified that while Jones was in the townhome, she felt scared because he was talking about a gun and his hands were in his pocket. During a police interview, Pennington admitted to hitting Jones multiple times on the head because he felt threatened by Jones.

When we construe the evidence in the light most favorable to Pennington, there is no evidence supporting an instruction of involuntary manslaughter through the lawful act of self-defense. The record contains no evidence that Jones ever acted in a manner such that Pennington could have reasonably believed that force was necessary to protect him or the others at the townhome. Jones never made an explicit threat towards James, Soverns, or Pennington, nor was there any evidence that he was observed handling any

weapons or acting in an aggressive manner. Furthermore, there is no evidence that James, Soverns, or Pennington were fearful of Jones when the incident occurred. The only evidence in the record indicates that when the incident happened, Jones was speaking and acting calmly. Pennington never indicated that he believed Jones had a weapon when he struck Jones with the bat. Based on this evidence, even if Pennington believed he had a right to use self-defense, this belief was unreasonable. Consequently, any purported act of self-defense was an unlawful act, rather than the lawful one required for an involuntary manslaughter instruction.

Moreover, the trial court properly omitted an instruction for involuntary manslaughter, because it only applies to unintentional killings. Since Pennington admitted to hitting Jones with a baseball bat and there is no evidence in the record indicating that the multiple blows to Jones' head were accidental, Pennington's actions in hitting Jones with the baseball bat were intentional.

A similar issue was recently considered by our Supreme Court in *State v. Houston*, 289 Kan. 252, 213 P.3d 728 (2009). In *Houston*, the defendant made an argument similar to the one that Pennington makes. Houston maintained that he did not intend to kill the victim, but his use of excessive force resulted in the victim's death. As a result, Houston reasoned that the proper conviction should have been involuntary manslaughter.

After finding that Houston's actions were intentional, the court then proceeded to consider whether Houston also intended to kill the victim. In considering the issue, the court noted that during trial, Houston never disputed that he intentionally pulled the trigger on the gun that killed the victim or that he aimed the gun at the victim's head. 289 Kan. at 275. Furthermore, the evidence showed that Houston fired the gun from a distance as close as 3-15 feet away. 289 Kan. at 275-76. The court ultimately found that this evidence, coupled with the transcript of Houston's statement to police, the placement of the gun shell casings in close proximity to the victim's person, and photographs of the victim's injuries, required a finding that Houston intended to kill his victim. 289 Kan. at 276. Consequently, our Supreme Court held that no rational jury could have found that Houston did not intend to kill his

victim. By extension, "[b]ecause involuntary manslaughter requires an unintentional killing, the evidence would not reasonably justify a conviction of that crime. . . . Accordingly, the trial court did not err in refusing such an instruction." 289 Kan. at 276.

This case is analogous to *Houston*. The defendant in *Houston* never disputed pulling the trigger and aiming the gun at the victim from a short distance. Here, Pennington admitted to administering the blows that killed Jones from a very close range. In addition, the jury was shown photographs of Jones' injuries and was played a tape of Pennington's confession, in which he admitted to hitting Jones with the baseball bat. The trial testimony revealed that Pennington continued to hit Jones after he was already down on the floor gargling in his own blood.

As in *Houston*, no reasonable jury could have found that Pennington did not intend to kill Jones. Pennington admittedly and intentionally chose to inflict deadly force upon Jones at close range. Furthermore, even after Jones was down on the ground and rendered helpless, Pennington continued to hit him until his death. Therefore, the trial court properly excluded an instruction on involuntary manslaughter because the only evidence in the record shows that Pennington intended to kill Jones.

For all of these reasons, Pennington's claim of error fails.

*Did the Trial Court Clearly Err in Providing a Deadlocked Jury Instruction Before Deliberations?*

Next, Pennington argues that the trial court committed reversible error when it gave the jury a deadlocked jury instruction before deliberations. The State recognizes that the specific instruction given was found to be in error in *Salts*, 288 Kan. at 266-67, but nonetheless argues that there was no clear error because even with the error, there is no real possibility the jury would have rendered a different verdict.

Pennington never voiced an objection to the inclusion of this instruction. Where a party neither suggests an instruction nor objects to omission, an appellate court reviewing a trial court's failure to give a particular instruction applies a clearly erroneous standard. *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006). Jury

instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *Salts*, 288 Kan. at 265-66.

In providing jury instructions, while not mandatory, the use of PIK instructions is strongly recommended due to the fact that these instructions " 'have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions.' " *Salts*, 288 Kan. at 266; *State v. Gallegos*, 286 Kan. 869, 878, 190 P.3d 226 (2008).

Before deliberations, the trial court furnished the jury the deadlocked jury instruction, an *Allen*-type instruction, which originated from *Allen v. United States*, 164 U.S. 492, 41 L. Ed. 528, 17 S. Ct. 154 (1896):

"Like all cases, this is an important case. If you fail to reach a decision, the charge is left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge to a different jury at a later time. *Another trial would be a burden on both sides.*

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." (Emphasis added.)

With minor variations in wording, the provided instruction mirrors PIK Crim. 3d 68.12.

Over the years, Kansas appellate courts have considered various versions of the deadlocked jury instruction. Although at certain points the instruction's wording has been found to be erroneous, criticisms of the language has never led to reversal of a conviction when the instruction was given before deliberations. *Salts*, 288 Kan. at 266; *State v. Anthony*, 282 Kan. 201, 216, 145 P.3d 1 (2006); *State v. Makthepharak*, 276 Kan. 563, 569, 78 P.3d 412 (2003). These decisions have largely been premised on the under-

standing that when the deadlocked instruction is given after jury deliberations begin, it is coercive and exerts undue pressure on the jury to reach a verdict. Nevertheless, when the instruction is given before deliberations, much of its coercive effect is removed. *State v. Struzik*, 269 Kan. 95, 109, 5 P.3d 502 (2000).

In *Salts*, our Supreme Court considered the same version of the deadlocked jury instruction provided in this case. In doing so, the court found that the language " '[a]nother trial would be a burden on both sides' " is an incorrect and erroneous statement of the law. 288 Kan. at 266-67. Specifically, the court found that contrary to the instruction's language,

"a second trial may be burdensome to some but not all on either side of a criminal case. . . .

"We therefore hold that including the language '[a]nother trial would be a burden on both sides' in PIK Crim. 3d 68.12 is error. The PIK Committee should strike this language from this instruction. If the Committee believes that the message the State wishes to deliver—that jurors should treat the matter seriously and keep an open mind—should be communicated to criminal juries, then the pattern instruction should be changed to state exactly that." 288 Kan. at 266-67.

Although the *Salts* court found the current language of PIK Crim. 3d 68.12 to be erroneous, the court refused to reverse Salts' conviction under the clearly erroneous standard because it found no real possibility that the jury would have rendered a different verdict had the error not occurred. 288 Kan. at 266-67.

Based on *Salts*, the deadlocked jury instruction in this case was erroneous. Despite this error, because Pennington admitted to administering the blows that killed Jones and the jury rejected his self-defense theory, the evidence overwhelmingly supported the jury verdict. For this reason, there was no real possibility that the jury would have rendered a different verdict had the error not occurred. As a result, Pennington's claim of error on this issue fails.

*Did Cumulative Errors Deny Pennington's Right to a Fair Trial?*

Finally, Pennington argues that the trial court's cumulative errors denied his right to a fair trial and, therefore, violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial before an impartial jury. Generally, cumulative trial errors, when considered

collectively, may be so great so as to require reversal of a defendant's conviction. "The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative error rule if the evidence is overwhelming against a defendant. [Citation omitted.]" *State v. Hoffman*, 288 Kan. 100, 109-10, 200 P.3d 1254 (2009). Furthermore, cumulative error will not be found where the record fails to support the errors raised by the defendant—[o]ne error is insufficient to support reversal under the cumulative effect rule. [Citation omitted.]" 288 Kan. at 110. Because no error occurred in relation to Pennington's other appellate issues, the doctrine cannot be applied to this case. As a result, Pennington's argument fails.

Affirmed.