NOT DESIGNATED FOR PUBLICATION

No. 119,763

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

NICHOLAS ALEXANDER MILLER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Opinion filed August 16, 2019. Affirmed.

*Carl E. Cornwell*, of Olathe, for appellant.

*James Antwone Floyd*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., PIERRON, J., and BURGESS, S.J.

PER CURIAM:  A jury convicted Nicholas Alexander Miller of second-degree murder after he shot and killed William Rodella-Mecino. On appeal, Miller argues the granting of the motion in limine and the denial of the self-defense instruction were error. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 15, 2018, a jury found Miller guilty of the second-degree murder of William Rodella-Mecino. Miller was the son-in-law of Mario Sandoval, who lived across

1

the street from the victim's family. William lived in his home with his wife and three daughters. The Rodella-Mecinos and the Sandovals did not get along.

The incident in question occurred on July 20, 2016. Mario Sandoval's son, Ruben Sandoval, got into an argument with William. Ruben was in the Sandoval's garage, and claimed to see William and another man drive by their house twice while making hand gestures pretending their fingers were guns. Ruben walked up the street to confront William and the other man, but he initially was only able to confront Mrs. Rodella-Mecino. Eventually, a heated argument ensued with Ruben and William screaming at each other. Ruben stood on the sidewalk yelling at William who was standing on a sidewalk that went between his house and the street. William pulled a pistol out of his pants, cocked it, and held it at his side without pointing it at Ruben or anyone else.

At this point, Miller and several other people including members of the Sandoval family approached to investigate the commotion. Miller saw the pistol in William's hand. He never saw William leave his own property during the encounter. Miller waved to other people in the vicinity, beckoning them to come and assist in the situation. Miller ran down the street to his girlfriend's car to retrieve an AR-15 rifle from the trunk. Miller said he was afraid William was going to hurt someone. Miller did not hear William threaten anyone directly, rather he said, "I believe pulling out a pistol, I believe that's threatening enough."

Miller returned and aimed the rifle at William telling him to drop his gun. The two looked at each other while Miller kept his weapon aimed at him. Up until this point, William had not aimed or pointed his pistol at anyone. Mario Sr. and another man named Edgar pulled Miller away from the confrontation and escorted Miller all the way to the end of the street, with Miller fighting against them. Miller stayed in this location for only a few seconds. Miller still believed William was going to hurt someone, so he chose to return to the confrontation with the sole intent to "get William to put his gun down."

Miller then ran from the end of the street to behind William's house via a back alley carrying the rifle. During this time, William had moved from his front yard to the porch of his house. When Miller drew near to the backside of the house on his return, he neither heard nor saw any signs the fight was still happening.

As Miller entered the alley behind the house, William turned around and the two men saw each other. William fired two shots at Miller from the corner of his porch, but both shots missed. Miller fired four shots, and testified to not knowing whether he hit William or not. William was struck in the leg and head and died at the hospital. The State initially charged Miller with second-degree murder but later amended the charge to first-degree murder.

During William's autopsy, amphetamine and methamphetamine were found in his system, and the State filed a motion in limine to exclude evidence of these drugs. The State argued the presence of drugs in the victim's system was not relevant, and even if they were relevant, their admission would only serve to inflame the passions of the jury. The State pointed out that Miller and no other party provided testimony that they knew William had drugs in his system. It also argued the presence of drugs did not prove or disprove any material fact. Miller argued the presence of drugs provided the reason for the victim's behavior which justified Miller acting in self-defense. The district court granted the motion.

At trial, Miller requested a self-defense instruction be given to the jury. The district court believed Miller was the aggressor and denied the request saying a self-defense is not available to a person who is an initial aggressor. It also found William's actions did not constitute imminent unlawful force. The jury found Miller guilty of second-degree murder. Miller appeals.

ANALYSIS

*Motion in Limine*

Miller argues the district court should have denied the State's motion in limine which excluded the toxicology report showing methamphetamine and amphetamines in William's system. The district court found the report was not relevant, but Miller contends the evidence of drugs in the victim's system was relevant and should have been considered by the jury. The toxicology report is not included in the record on appeal.

Miller argues that the "toxicology screen of the victim is relevant, as it proves that [William] was under the influence of methamphetamine during his interaction and subsequent altercation with Mr. Miller." After mentioning William's behavior as having been menacing and erratic while brandishing a weapon, Miller claims he acted in self-defense and defense of others. The motion in limine excluded the evidence showing the presence of methamphetamine in William, and the motion neither mentioned nor excluded evidence of the behavior of William. Miller's arguments fail to show why the presence of drugs in William was relevant.

The Kansas Court of Appeals reviews a decision regarding a motion in limine in a similar manner to a decision regarding an evidentiary ruling. The court must first determine the relevance of the challenged evidence, i.e., whether the evidence is probative and material. *State v. Frierson*, 298 Kan. 1005, 1015, 319 P.3d 515 (2014). "'Relevant evidence' means evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The district court's determination of the evidence's probative value is reviewed for an abuse of discretion, and the district court's determination that the evidence is material is subject to de novo review. 298 Kan. at 1015. The district court found the causes for William's behavior which may have given rise to Miller killing him

4

were irrelevant to the case as a whole. At the hearing on the motion, the district judge stated:

> "I'm not sure the defense needs a reason if the decedent was acting erratically or in a crazy manner or in a hyper manner, excitable manner, all the things that are commonly associated with methamphetamine. Even if that provides a reason for his actions, I'm not sure that it still makes it relevant, and it's not that the reasons for his actions don't matter, but if he was acting inappropriately or violently or recklessly, that fact remains. I guess the reason for it doesn't matter."

Miller's argument for the evidence's relevance fails because he offers no substantive material point which the toxicology report would have supported, and de novo review of the presence of methamphetamine in the victim's system at the time of death provides no materiality to the laws in question in Miller's case. Evidence is material when the fact it supports is in dispute and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). At the hearing on the motion in limine, the State did not dispute the fact William had drugs in his system or was acting erratically, but instead argues the knowledge of the presence of methamphetamine in William had no relation to Miller's decision to kill. Arguments at the motion's hearing indicate no one was even aware the victim had methamphetamine in his system until after the autopsy.

Miller's charges ultimately resulted in jury instructions for first-degree murder, attempted first-degree murder, second-degree murder, attempted second-degree murder, voluntary manslaughter, and attempted voluntary manslaughter. None of these mention William's mental state or motivations as an element. Miller did request a self-defense instruction, but he still provides no connection between his belief in the necessity of deadly force at the time of the incident and the presence of methamphetamine in William. Miller makes no claim he was reacting to any particular drug induced behavior on the part of William. In fact, there is no evidence to suggest Miller knew methamphetamine

5

was in the victim's system when he killed him. The State argued this in its motion in limine and at the hearing on the motion. Miller did not contest the fact he was unaware of the drugs in the William's system at the time of the killing.

The State cites *State v. Pennington*, 43 Kan. App. 2d 446, 456, 227 P.3d 978 (2010) to support the district court's approval of the State's motion to exclude the toxicology report. In *Pennington*, the defendant killed Lavirgil DeShawn Jones, and drugs were found to be present in Jones' system at his time of death. The trial court excluded the presence of drugs because no evidence in the record suggested Pennington knew Jones was under the influence of drugs on the day of the incident. The panel from this court upheld this exclusion stating: "Absent any evidence in the record that Pennington observed clues regarding Jones' drug usage or that Jones' drug usage caused him to act as an aggressor, this evidence was irrelevant and could not have played into Pennington's decision-making process on the day of the incident." 43 Kan. App. 2d at 459. In the case at hand, the post-death discovery of methamphetamine in the victim's system bears no materiality to Miller's mens rea at the time he shot and killed William. Because the elements of the charges relate only to Miller's mental state, not William's, the cause of the victim's behavior is not material. Thus, the toxicology report is not relevant. Having determined that the evidence was not relevant, there is no need to address the issue of the probative value of the evidence.

The district court did not abuse its discretion when granting the motion in limine.

*Self-defense Instruction*

Miller next argues the district court erred when it refused to provide the jury with a self-defense instruction. A criminal defendant generally is entitled to an instruction on the law applicable to his or her theory of defense if the instruction would be both legally and factually appropriate. Factual appropriateness requires sufficient evidence for a

6

rational fact-finder to find for the defendant on that theory. If the defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. *State v. Dupree*, 304 Kan. 377, 397, 373 P.3d 811, *cert. denied* 137 S. Ct. 310 (2016).

> "When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.' [Citation omitted.]" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Regarding the first step, Miller properly preserved the district court's rejection of the self-defense instruction at trial. For the second step, appellate courts must consider whether the instruction was legally and factually appropriate, using an unlimited review of the entire record. 307 Kan. at 318. The Kansas Supreme Court has held a jury instruction for self-defense can be appropriate for a charge of first-degree murder. *State v. Salary*, 301 Kan. 586, 592, 343 P.3d 1165 (2015). The charges brought against Miller included first-degree murder, so the jury instruction for self-defense could have been legally appropriate.

An instruction must also be factually appropriate, and both statutes and caselaw address what facts make self-defense appropriate. *State v. Knox*, 301 Kan. 671, 677-78, 347 P.3d 656 (2015). A person may use force in self-defense if the person reasonably believes it is necessary to defend themselves or a third person against another person's imminent use of unlawful force. K.S.A. 2018 Supp. 21-5222(a). "A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person." K.S.A. 2018 Supp. 21-5222(b).

7

"These subsections establish a two-part test, the first of which is subjective. It requires a showing that the defendant sincerely and honestly believed the use of deadly force in defense of self was necessary. The second part is objective. It requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in defense of self was necessary." *Salary*, 301 Kan. at 593-94.

The district court found Miller subjectively believed he needed to use force in self-defense, but it found Miller's belief to be objectively unreasonable. The record supports Miller's subjective belief his use of force was necessary. However, the record also supports the district court's finding that Miller's belief in the necessity of deadly force in self-defense was objectively unreasonable. A reasonable person in Miller's situation would not have believed deadly force was necessary to prevent *imminent* death or great bodily harm. See K.S.A. 2018 Supp. 21-5222(b); *Salary*, 301 Kan. at 593-94. The facts presented at trial support this finding.

Miller testified about his actions and perception of the events in question. He witnessed the argument between Ruben and William. William was standing in his front yard with a pistol in his hand. Even though William never left his own property or pointed the pistol at anyone at that point of the encounter, Miller ran down the street to his girlfriend's car to retrieve an AR-15 rifle from the trunk. Miller said he was afraid William was going to hurt someone. He did not directly testify that William threatened anyone directly, rather he said, "I believe pulling out a pistol, I believe that's threatening enough."

Miller returned and aimed the rifle at William telling him to drop his gun. Up until this point, William still had not aimed or pointed his pistol at anyone. Miller was pulled away from the confrontation, and escorted all the way to the end of the street by others. He stayed in this location for only a few seconds before deciding to return to the confrontation. Still believing William was going to hurt someone, he chose to return to the argument with the sole intent to "get William to put his gun down." Miller ran behind

8

William's house via a back alley with the rifle. When Miller drew near to the backside of the house on his return, he did not hear or see any signs the fight was still happening.

As Miller entered the alley behind William's house, the two men saw each other and exchanged fire. Miller fired four shots, and testified to not knowing whether he hit William or not.

Reviewing the appropriateness of self-defense in light of the above facts shows the district court properly denied the requested instruction. In order to be justified in his use of deadly force, Miller had to reasonably believe his use of deadly force was necessary to prevent *imminent* death or great bodily harm. See K.S.A. 2018 Supp. 21-5222(b). Miller's own testimony at trial shows no imminence of the use of force by William. No testimony showed William ever pointed his pistol at anyone before Miller snuck up behind him, and Miller himself conceded William never left his own property. Miller believed William's possession of the pistol necessitated aiming his rifle at him. The self-defense statute addresses this type of situation saying:

> "Any threat to cause death or great bodily harm, including, but not limited to, by the *display* or *production of a weapon*, *shall not* constitute use of deadly force, so long as the actor's purpose is limited to creating an apprehension that the actor will, if necessary, use deadly force in defense of such actor or another or to affect a lawful arrest." (Emphasis added.) K.S.A. 2018 Supp. 21-5221(a)(2).

With this in mind, William's possession and display of his pistol by itself did not reasonably justify Miller's use of deadly force in self-defense. Rather, it shows William intended to create the apprehension he would use force if necessary. During his argument with members of the Sandoval family, William never left his own property, and although he produced a pistol, he never pointed the weapon at anyone. After Miller pointed his rifle at William and was pulled away by others, the argument seemed to de-escalate. At this point, deadly force was not imminent for any party involved. Rather than let the

9

situation continue to de-escalate, Miller returned to the scene and attempted to sneak behind William with his rifle. When William shot at Miller, it was the first time William pointed his weapon at anyone. On these grounds, the district court found a self-defense instruction on Miller's behalf would have been factually inappropriate.

The district court further concluded Miller was the initial aggressor in his ultimate encounter with the victim. The district judge stated, "I believe K.S.A. 21-3214 says that a self-defense instruction is not available to one who is an initial aggressor in the incident or confrontation." The current version of K.S.A. 21-3214, K.S.A. 2018 Supp. 21-5226, stipulates a self-defense justification is "not available to a person who . . . initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant." K.S.A. 2018 Supp. 21-5226(b). It further states self-defense is not available to a person who:

> "(c) otherwise *initially provokes* the use of any force against such person or another, unless:
> (1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has *exhausted every reasonable means to escape* such danger other than the use of deadly force; or
> (2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." (Emphases added.) K.S.A. 2018 Supp. 21-5226(c)(1) and (2).

Kansas Supreme Court caselaw applies this statute in a straightforward manner stating: "The justification of self-defense is not available to a person who initially provokes the use of force unless he or she has exhausted every means to escape from imminent danger or has communicated the good-faith intent to terminate the use of force." *Knox*, 301 Kan. 671, Syl. ¶ 1. By provoking the use of force against oneself, a self-defense instruction becomes factually inappropriate. 301 Kan. at 678. In addition to

10

Miller's objectively unreasonable perception that William's use of force was imminent, Miller had left the situation when Mario Sr. and another man named Edgar pulled him away, but he returned. By Miller's own admission he could have stayed away, but he chose to return. When Miller returned, he became the initial aggressor.

Simply put, Miller did the opposite of exhausting every reasonable means to escape, and the danger posed by William was not imminent. Additionally, because Miller was the initial aggressor when he shot William, a self-defense instruction was factually inappropriate, and the district court committed no error when denying it.

Affirmed.